## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SKENDER ALIJAJ,<br><br>    Plaintiff,<br><br>    v.<br><br>WELLS FARGO,<br><br>    Defendant. | Civil Action No. 1:17-cv-01887-VSB<br><br>**DEFENDANT'S LOCAL CIVIL RULE 56.1 STATEMENT OF MATERIAL FACTS** |

In accordance with Local Civil Rule 56.1, Defendant Wells Fargo Bank, N.A. ("Wells Fargo" or the "Company"), submits the following Statement of Material Facts in support of its motion for summary judgment.

### I.    Plaintiff Is Hired by Wells Fargo.

1.    On or about August 23, 2011, Plaintiff applied for employment with Wells Fargo in the position of Business Initiatives Manager.  (Emp't Appl., Bates pp. WF-Alijaj 1-6, Ex. C to Tandy Certif.[1]; Pl.'s Dep. 20:8-11.[2])

2.    The written application Plaintiff completed to apply for the position contained a certification right above Plaintiff's signature, headed "Truth and Completeness of Application" and stating:

> I certify that all my answers on this application are true and complete.  I understand that the falsification, omission or misrepresentation of fact on this application (or any other accompanying or required documents) may be cause for denial of employment or immediate termination of employment if hired, regardless of when or how discovered....

(Emp't Appl. Bates p. WF-Alijaj 6.)

---

[1] "Tandy Certif." refers to the Certification of Colleen P. Tandy, submitted herewith.

[2] "Pl.'s Dep." refers to the transcript of Plaintiff's deposition, which is attached as Exhibit B to the Certification of Colleen P. Tandy.

3.       The written application included the question, "Have you ever been involuntarily discharged or asked to resign from a position"?  (Emp't Appl. Bates p. WF-Alijaj 3.)

4.       Plaintiff answered "No."  (Emp't Appl. Bates p. WF-Alijaj 3.)

5.       Plaintiff, however, testified at his deposition that he was terminated from two prior employers: J.P. Morgan Securities and Deutsche Bank. (Pl.'s Dep. 16:10-11; 17:23:18-8.)

6.       Plaintiff had begun working for J. P. Morgan Securities in the Spring of 1997, and at some point there was a "new manager" in Plaintiff's group who "wrote [Plaintiff] up for underperforming and then [Plaintiff] was let go some time thereafter" in 2000.  (Pl.'s Dep. 16:15-17, 20:18-21:25.)

7.       Plaintiff was terminated from Deutsche Bank in a downsizing in 2009.  (Pl.'s Dep. 17:23:18-8.)

8.       There is no evidence Wells Fargo learned of Plaintiff's falsification of his application during the course of his employment.

9.       On September 6, 2011, Plaintiff was hired by Wells Fargo with the title of Business Initiatives Manager.  (Pl.'s Dep. 20:8-16, 31:8-13, 35:2-8.)

10.      Plaintiff understood when Wells Fargo hired him that he was an employee-at-will, which he testified at deposition meant "Wells Fargo and other companies can fire employees for any reason or no reason at all."  (Pl.'s Dep. 30:4-14; Dep. Ex. Alijaj-1, Ex. D to Tandy Certif.; Pl.'s Dep. 29:4-8, 30:15-32:16; Dep. Ex. Alijaj-2, Ex. E to Tandy Certif.; Pl.'s Dep. 29:9-17, 34:13-36:3; Dep. Ex. Alijaj-3, Ex. F to Tandy Certif.; Pl.'s Dep. 29:18-23, 31:17-23, 32:24-34:12.)

11.      Plaintiff is of European origin; he was born in Kosovo and identifies as Albanian. Plaintiff moved to the United States when he was eight years old.  (Pl.'s Dep. 117:4-12, 213:19-22.)

12.     Plaintiff's religion is Muslim.  (Pl.'s Dep. 212:20-213:2.)

13.     Plaintiff's date of birth is August 17, 1965; Plaintiff was 46 years old when he became an employee of Wells Fargo in September 2011.  (Pl.'s Dep. 48:19-22.)

## II.     Plaintiff's Tenure in the Equity Derivatives Group.

### A.     Plaintiff Begins Working in the Equity Derivatives Group.

14.     Upon Wells Fargo's hiring of Plaintiff, he began working in the Equity Derivatives Group, where he remained until February 2015, when he transferred to the Securities Lending Group.  (Pl.'s Dep. 36:4-37:9, 42:16-20.)

15.     Plaintiff worked in Wells Fargo's New York City office at 375 Park Avenue.  (Pl.'s Dep. 36:19-22.)

16.     Plaintiff held the rank of Financial Consultant 4 and was one of 10 Product Controllers in the Equity Derivatives Group.  (Pl.'s Dep. 37:13-14, 41:14-42:2.)

17.     Plaintiff's duties in the Equity Derivatives Group included the preparation of daily profit and loss ("P&L") statements, month-end reconciliations between profit and loss and the General Ledger, and other, miscellaneous reconciliations.  (Pl.'s Dep. 37:15-38:8.)

### B.     Plaintiff's Performance in the Equity Derivatives Group.

18.     In or around July 2013, there was a change in management of the Equity Derivatives Group, with George Pawlush ("Pawlush"), CPA and Finance Manager, taking it over.  (Pl.'s Dep. 40:16-19; Compl., Doc. 1, p.28 of 55, Ex. A to Tandy Certif.)

19.     At that time, Plaintiff began reporting to Michael Tracy ("Tracy"), Financial Consultant; Tracy reported to Pawlush; Pawlush reported to Robert Rottmann ("Rottmann"), Managing Director-Finance.  (Pl.'s Dep. 38:12-22, 39:8-12, 40:10-13, 68:13-14; Compl. p.19 of 55.)

20.     Both Pawlush and Rottmann were based in Charlotte, North Carolina.  (Pl.'s Dep. 66:3-5, 68:11-12.)

21.     Under Tracy, Plaintiff's duties included "flow derivatives P&L," later "cash equity P&L," and "other stuff" that Plaintiff "do[es]n't recall."  (Pl.'s Dep. 39:16-40:6.)

22.     As head of the Equity Derivatives Group, Pawlush initiated changes in job expectations and requirements.  "He had certain expectations of all product controllers.  He wanted to streamline the P&L process.  All product controllers [became] responsible for the daily P&L, month-end reconciliation, balance sheet, pricing, month end pricing."  (Pl.'s Dep. 40:23-41:10.)

23.     Pawlush's expectations extended to "all product controllers," not just Plaintiff.  (Pl.'s Dep. 41:11-13.)

24.     Pawlush prepared Plaintiff's 2013 review, which was entitled 2013 Year End Performance Evaluation.  (Dep. Ex. Alijaj-5, Ex. G to Tandy Certif.; Pl.'s Dep. 45:15-46:6.)

25.     Plaintiff's overall ranking on his review was a "3" out of "5."  (Dep. Ex. Alijaj-5 Bates p. WF-Alijaj 49; Pl.'s Dep. 46:10-12.)

26.     The ranking is in ascending order, with a "1" meaning "Significantly below all key targets," and a "5" meaning "Significantly above all key targets."  (Dep. Ex. Alijaj-5 Bates p. WF-Alijaj 49; Pl.'s Dep. 46:19-47:2.)

27.     Plaintiff's rating of "3" meant he "Met all and may have exceeded some key targets."  (Dep. Ex. Alijaj-5 Bates p. WF-Alijaj 49; Pl.'s Dep. 46:10-18, 47:3-7.)

28.     When asked whether a "3" is "considered a negative rating," Plaintiff answered "no."  (Pl.'s Dep. 56:25-57:3.)

29.     Plaintiff went further than that, conceding that a "3" rating was good, and that it made him eligible for bonuses:

> Q.     You stated that your performance review was negative.  Can you explain how a three, which is a good or in the middle rating is a negative rating?
>
> A.     So three is average, everybody gets a three to get a bonus at Wells Fargo.  You need a minimum of three to get a bonus.
>
> Q.     To get a bonus, correct.  But not everybody gets a three?
>
> A.     Others get higher.
>
> Q.     Based upon their performance, right?
>
> A.     Right.
>
> Q.     And others get lower, correct?
>
> A.     Yes.
>
> Q.     And that's why we have five different rankings, right?
>
> A.     Yes.
>
> Q.     Some employees get ones, correct?
>
> A.     Yes, possibly.  I don't know if they get ones.
>
> Q.     So you received the ranking or the rating of a three, which as you testified makes you eligible for bonuses, correct?
>
> A.     Yes.
>
> Q.     And bonuses are given out to employees because they did work that was considered good for Wells Fargo, correct?
>
> A.     Correct.

(Pl.'s Dep. 47:8-48:12.)

30.     Plaintiff, in fact, received a bonus based on his 2013 performance.  (Pl.'s Dep. 55:10-56:21.)

31.     Plaintiff's 2014 Evaluation indicates it was completed by Plaintiff's immediate supervisor, Michael Tracy.  (Dep. Ex. Alijaj-4 Bates p. WF-Alijaj 39, Ex. H to Tandy Certif.; Pl.'s Dep. 88:11-22.)

32.     Plaintiff asserts no claims of discrimination against Tracy.  (Pl.'s Dep. 40:7-9, 43:22-44:2.)

33.     Moreover, the 2014 Evaluation, like the 2013 Evaluation, gave Plaintiff an overall rating of "3" out of five, meaning, to repeat, that Plaintiff "Met all and may have exceeded some targets."  (Dep. Ex. Alijaj-4 Bates p.41; Pl.'s Dep. 87:12-17.)

34.     Plaintiff conceded, once again, that "3" was "considered a good rating."  (Pl.'s Dep. 88:2-5.)

35.     Plaintiff has no idea what overall rating any other employees in Pawlush's group received in their 2014 Year End Performance Evaluations.  (Pl.'s Dep. 92:8-24.)

**III.    Plaintiff's Transfer to the Securities Lending Group.**

36.     Plaintiff's transfer to the Securities Lending Group was suggested to him by Pawlush in the second half of January 2015.  (Pl.'s Dep. 42:21-24, 58:11-19.)

37.     Pawlush told Plaintiff "[i]t would be a good fit" and "a good opportunity." (Pl.'s Dep. 58:20-25.)

38.     On January 21, 2015, Plaintiff received a copy of the description of the Product Controller role in the Securities Lending Group.  (Dep. Ex. Alijaj-6, Ex. I to Tandy Certif.; Pl.'s Dep. 57:4-58:15.)

39.     On or about January 22, 2015, Plaintiff accepted the offer to transfer to the Securities Lending Group in the Product Controller role.  (Dep. Ex. Alijaj-6 Bates. p. WF-Alijaj 495; Pl.'s Dep. 63:17-19.)

40.     Plaintiff's transfer to the Securities Lending Group became effective in or about February 2015.  (Pl.'s Dep. 42:16-20, 63:21-25.)

**IV.    Plaintiff's Tenure in the Securities Lending Group.**

41.     The description of the Securities Lending Product Controller's role that Plaintiff received on January 21, 2015, was as follows:

6

> The position is responsible for the Finance and Accounting support of the Securities Lending Desk within the Wells Fargo Securities business unit. This position encompasses all aspects of supporting the Securities Lending desk including daily P&L and balance sheet, daily journal entries, monthly forecasting, monthly actual reporting and some reconciliations. The position will work with a number of groups including Front Office, Middle Office, Technology and Operations.

(Dep. Ex. Alijaj-6 Bates p. WF-Alijaj 494.)

42.     At deposition, in responding to the question whether his job duties and responsibilities in Securities Lending were similar to those he had in Equity Derivatives, Plaintiff testified, "It was producing P&Ls, but it was learning new systems, new processes."  (Pl.'s Dep. 59:6-11.)

43.     In Securities Lending, Plaintiff reported to Catherine Marsicano ("Marsicano"), a Financial Consultant 5, who worked in the same office as Plaintiff in New York City.  (Pl.'s Dep. 65:12-19, 68:6-8.)

44.     Marsicano reported to Michael Fogarty ("Fogarty"), Finance Manager, who was based in Charlotte, North Carolina.  (Pl.'s Dep. 65:5-7, 68:3-5.)

45.     Fogarty reported to Rottmann, also based in Charlotte, North Carolina.  (Pl.'s Dep. 68:9-12.)

A.     **Plaintiff's May 1, 2015, Meeting with Marsicano.**

46.     On or about May 1, 2015, Marsicano met with Plaintiff because she was concerned that he seemed unhappy at work and there were problems with his attitude and performance.  (Dep. Ex. Alijaj-7 (May 5, 2015 e-mail from Marsicano to Fogarty, Subject: Meeting 5/1 Notes), Ex. J to Tandy Certif.; Pl.'s Dep. 74:19-25.)

47.     Plaintiff complained that Pawlush had "sold" him something different from the role he actually obtained in the Securities Lending Group.  He complained that he believed he would be reporting directly to Fogarty, Marsicano's supervisor, rather than to Marsicano.  He complained

he was "not getting full support" from Marsicano, that she was "not showing me everything." (Dep. Ex. Alijaj-7; Pl.'s Dep. 76:24-78:24.)

48.     Marsicano, for her part, discussed with Plaintiff her efforts to teach him Prime P&L statements, and his apparent lack of interest in learning about them.  (Dep. Ex. Alijaj-7.)

49.     When Marsicano scheduled meetings with Plaintiff to review P&L statements, Plaintiff would show up to them 10 to 15 minutes late.  (Dep. Ex. Alijaj-7; Pl.'s Dep. 80:6-15.)

50.     On April 30, 2015 – the day before Plaintiff's May 1 meeting with Marsicano – Plaintiff worked from home without telling Marsicano in advance that he was going to do so. (Dep. Ex. Alijaj-7; Pl.'s Dep. 80:21-25.)

51.     That day, Marsicano and Plaintiff were scheduled to review the Prime P&L. Marsicano reminded Plaintiff by e-mail.  After 45 minutes, Plaintiff finally responded by instant messaging that he wanted to do it another time instead.  When Marsicano asked Plaintiff about this episode at their May 1, 2015, meeting, Plaintiff explained that "he didn't feel like looking at it that day."  (Dep. Ex. Alijaj-7; Pl.'s Dep. 81:2-25.)

52.     Over several weeks preceding the May 1 meeting, Plaintiff had been leaving early without telling Marsicano why or even giving her a heads up.  When she mentioned that to Plaintiff at the meeting, Plaintiff did not explain beyond saying Marsicano "should know he would only leave early if he had to."  (Dep. Ex. Alijaj-7; Pl.'s Dep. 82:19-83:3.)

53.     Marsicano memorialized her May 1, 2015, meeting with Plaintiff in a May 5, 2015, e-mail to Fogarty, in which she also noted, "In the short time that he's [Plaintiff] been here, I noticed that he doesn't like following up with people and he often thinks that responsibility lies with everyone else to get things done.  In that sense I've had to push to get him to follow up with people."  (Dep. Ex. Alijaj-7; Pl.'s Dep. 84:13-85:24.)

### B.   Plaintiff Meets with Robert Rottmann to Discuss His Performance.

54.   Plaintiff received his 2014 Year End Performance Evaluation, discussed above, which covered his work in the Equity Derivatives Group, on February 14, 2015. (Dep. Ex. Alijaj-4, Ex. H to Tandy Certif.; Pl.'s Dep. 86:8-9.)

55.   On May 1, 2015, months after Plaintiff's transfer to the Securities Lending Group, he submitted a "rebuttal" to his review, even though he had received a good overall rating. (Pl.'s Dep. 86:10-13; rebuttal in Dep. Ex. Alijaj-4 at Bates pp. WF-Alijaj 43-46.)

56.   Plaintiff's rebuttal does not allege national origin, religious, age, or any other type of discrimination. (Dep. Ex. Alijaj-4 Bates pp. WF-Alijaj 43-46.)

57.   On May 29, 2015, Rottmann met with Plaintiff to discuss the rebuttal, as well as Plaintiff's new role in the Securities Lending Group. (Dep. Ex. Alijaj-8 (May 29, 2015, e-mail from Rottmann to Fogarty), Ex. K to Tandy Certif.; Pl.'s Dep. 101:12-102:17.)

58.   Rottmann memorialized his meeting with Plaintiff in an e-mail to Fogarty of the same date. (Dep. Ex. Alijaj-8.)

59.   Rottmann told Plaintiff, and Plaintiff agreed, that productivity standards and job requirements were increasing for all finance team members; that all were being asked and expected to "raise the bar" on deliverables and deadlines; that employees (called "team members" at Wells Fargo) were all expected to adhere to the new standards and expectations for productivity; that there were rapid changes in the business due to regulatory changes; that because of all these changes, employees needed to be able to adapt, often with short lead times and a bare minimum of training; and that employees needed to show resolve, initiative, flexibility, and the ability to react positively to constructive criticism. (Dep. Ex. Alijaj-8; Pl.'s Dep. 104:22-105:24.)

60.     Plaintiff acknowledged to Rottmann that he had areas in which he needed to improve.  (Dep. Ex. Alijaj-8; Pl.'s Dep. 109:22-24.)

61.     Rottmann told Plaintiff that as a Financial Consultant 4, he was a senior member of the team and had to learn to adapt better and faster to change, that he had to put his full efforts into his current role and improve his productivity and attitude with his direct supervisor, Marsicano, and with Fogarty.  Rottmann explained to Plaintiff that "all team members" needed to "focus on delivering nothing but high performance productivity to be an effective part of the new targeted finance support model," and that Plaintiff's "on-going employment w[ould] be contingent upon addressing these issues."  (Dep. Ex. Alijaj-8.)

62.     Rottmann also summarized his perception that Plaintiff was clearly "struggling under the new higher standards of productivity and would prefer to operate at a slower pace where more training and handholding is the norm."  (Dep. Ex. Alijaj-8.)

63.     Rottmann told Plaintiff he would be tracking his future performance, productivity, and attitude with Marsicano and Fogarty and that "we were all here to help him succeed going forward."  (Dep. Ex. Alijaj-8.)

64.     Rottmann told Fogarty in the e-mail that he would be setting a time for the two of them and Marsicano to discuss Plaintiff's status and how best to manage his situation.  (Dep. Ex. Alijaj-8.)

### C.     Plaintiff Receives a Verbal Warning.

65.     On July 7, 2015, Fogarty gave Plaintiff a verbal informal warning via telephone, telling Plaintiff he was not meeting performance standards of a Financial Consultant 4.  (Dep. Ex. Alijaj-9 (July 7, 2015, e-mail from Fogarty to Rottmann & Marsicano, Bates p. WF-Alijaj 517), Ex. L to Tandy Certif.; Pl.'s Dep. 118:2-14; 122:6-13.)

10

66.     Fogarty told Plaintiff he wanted him to be successful in his role.  (Dep. Ex. Alijaj-9.)

67.     Fogarty told Plaintiff that he, Fogarty, made the decision to issue the warning. (Dep. Ex. Alijaj-9; Pl.'s Dep. 123:5-7.)

68.     Fogarty told Plaintiff he was expected to act with the "utmost professionalism" toward Marsicano, his immediate supervisor.  (Dep. Ex. Alijaj-9; Pl.'s Dep. 123:8-11.)

69.     Fogarty told Plaintiff he had to improve his relationship with Marsicano.  (Dep. Ex. Alijaj-9; Pl.'s Dep. 123:22-25.)

70.     Fogarty told Plaintiff he had to be more proactive; that he was not expected to know all the answers, but was expected to try and find the answers.  (Dep. Ex. Alijaj-9.)

71.     Fogarty told Plaintiff he had to show a positive attitude.  (Dep. Ex. Alijaj-9.)

72.     Fogarty instructed Plaintiff to get involved with new business initiatives.  (Dep. Ex. Alijaj-9.)

73.     Fogarty instructed Plaintiff to prepare the monthly outlook.  (Dep. Ex. Alijaj-9.)

74.     Fogarty instructed Plaintiff to compare actuals to outlook and investigate discrepancies.  (Dep. Ex. Alijaj-9.)

75.     Fogarty told Plaintiff he was tentatively scheduled to visit the Wells Fargo offices in New York City from July 27 through July 29.  (Dep. Ex. Alijaj-9; Pl.'s Dep. 125:12-15.)

76.     Fogarty memorialized his July 7, 2015, verbal warning to Plaintiff in an e-mail of the same date to Rottmann and Marsicano.  (Dep. Ex. Alijaj-9.)

77.     Plaintiff understands that because he was an employee-at-will of Wells Fargo, "legally" Fogarty was under no obligation to issue him a verbal warning and could simply have terminated his employment.  (Pl.'s Dep. 163:8-16.)

**D.      Plaintiff Is Placed on a Performance Improvement Plan.**

78.      Beginning July 10, 2015, three days after Fogarty delivered Plaintiff's verbal warning, Marsicano began sending Rottmann and Fogarty weekly e-mail updates on Plaintiff's performance.  (Dep. Ex. Alijaj-10, Ex. M to Tandy Certif., Bates p. WF-Alijaj 134.)

79.      Marsicano noted concerns with Plaintiff's performance, including that Plaintiff "struggled" with being proactive.  For example, Plaintiff failed to correct discrepancies with a P&L statement and sent it out with incorrect information.  Marsicano researched the problem, fixed it, and explained it to him.  Plaintiff also failed to complete Loanet testing and when Marsicano asked why, he answered that he had questions.  When she asked why he didn't come to her with his questions, Plaintiff "just shrugged."  Marsicano summarized Plaintiff's attitude as "one of expecting me to constantly hand hold and direct him on everything rather than taking responsibility for the tasks he's assigned."  (Dep. Ex. Alijaj-10 Bates p. WF-Alijaj 134.)

80.      On July 27, 2015, during Fogarty's visit to Wells Fargo's New York City offices, he had a meeting with Plaintiff in which he presented him with a Performance Improvement Plan (or "PIP").  (Dep. Ex. Alijaj-11, Ex. N to Tandy Certif.; Pl.'s Dep. 133:14-22, 135:25-136:16, 138:2-12, 149:8-11.)

81.      The PIP document explained that Plaintiff was being placed on a PIP because "[c]urrently your performance is not meeting the required standards of a Financial Consultant 4" and since Plaintiff and Fogarty's "previous discussions, your performance has not met acceptable performance standards and expectations."  The document also stated that it "serves as an informal warning."  (Dep. Ex. Alijaj-11 Bates p. WF-Alijaj 388.)

82.      Among other things, the PIP document advised Plaintiff to "Be proactive and have a positive attitude":

- Ask questions and schedule meetings when you don't understand something.

- Interact frequently with the front office, middle office, Operations and your manager.

- Be diligent in making sure tasks are accomplished and follow up with other teams as necessary.  Make sure everyone involved is aware of the outstanding items and where we stand.

- Be proactive in letting everyone know of potential issues. (i.e. copy on emails, chat, call) Don't wait for others to discover an issue and provide direction.

- Act as if you want to be the product controller for the Securities Lending desk at Wells Fargo.  If you do not want this role, then you should seek employment elsewhere.

(Dep. Ex. Alijaj-11 Bates pp. WF-Alijaj 388-89.)

83.   The PIP document instructed Plaintiff to "[s]how an interest" in learning about relevant systems.  (Dep. Ex. Alijaj-11 Bates p. WF-Alijaj 389.)

84.   Under the heading "Team Effectiveness," Plaintiff was told to "Maintain strong level of communication with team leaders Cathy Marsicano and Mike Fogarty," and "Minimize potential team disruption by accepting constructive criticism in a positive manner."  (Dep. Ex. Alijaj-11 Bates p. WF-Alijaj 389.)

85.   The PIP document warned Plaintiff, "You are expected to meet the performance standards for the Financial Consultant 4. If you do not consistently meet and sustain performance at an overall acceptable level, you may be subject to further corrective action, up to and including termination of employment."  (Dep. Ex. Alijaj-11 Bates p. WF-Alijaj 390.)

86.   Plaintiff testified that Fogarty reviewed each of these performance deficiencies with him. (Pl.'s Dep. 139:15-147:11.)

87. Plaintiff understood that if his performance did not improve, he could be terminated. (Pl.'s Dep. 147:3-6.)

88. Plaintiff refused to sign the PIP. (Pl.'s Dep. 138:13-17.)

89. When asked at deposition if Plaintiff thought the PIP was "an example of *discrimination*," he testified, "I think that the Performance Improvement Plan, the 1 warning [sic] was *retaliation* ... [f]or my rebuttals [sic]." (Pl.'s Dep. 137:14-21; emphasis added.)

90. As noted above, however, Plaintiff's rebuttal to his 2014 Evaluation did not mention national origin, religious, age, or any other type of discrimination. (*Supra* ¶¶55-56.)

91. Moreover, Plaintiff did *not* contact Human Resources about the PIP. (Pl.'s Dep. 137:10-13.)

92. Plaintiff likewise did *not* tell Fogarty that he felt in any way that the PIP was given to him because of his national origin, religion, or age. (Pl.'s Dep. 149:18-24.)

93. Pursuant to the PIP, Plaintiff began meeting with Fogarty and Marsicano on a weekly basis so they could provide Plaintiff with feedback and review his progress with respect to the PIP's mandates. When asked at deposition if Fogarty and Marsicano went through performance issues with him at those meetings, Plaintiff responded, "Mike Fogarty and Catherine Marsicano met with me on a Friday to review the past week's things that I wasn't doing correctly." (Dep. Ex. Alijaj-11 Bates p. WF-Alijaj 390; Pl.'s Dep. 149:25-150:11.)

94. Plaintiff understands that because he was an employee-at-will of Wells Fargo, "legally" Fogarty was under no obligation to issue him a PIP and could instead simply have terminated his employment. (Pl.'s Dep. 164:4-8.)

FPDOCS 34544780.1

95.     During Fogarty's visit, Plaintiff testified that Fogarty provided additional training to him each day of his visit. (Pl.'s Dep. 149:12-17; Dep. Ex. Alijaj-10 Bates p. WF-Alijaj 132, Ex. M to Tandy Certif.)

**E.     Plaintiff's Performance Continues to Deteriorate.**

96.     Marsicano and Fogarty scheduled weekly meetings with Plaintiff to review his performance and discuss any concerns.  These meetings lasted approximately thirty minutes. (Pl's Dep. 164:9-18.)

97.     After the PIP meeting, Plaintiff realized that his performance "had to improve." (Pl. Dep 151:2-8)

98.     Marsicano memorialized these performance meetings and Plaintiff's performance in weekly e-mails to Rottmann and Fogarty.  (Dep. Ex. Alijaj-10, Ex. M to Tandy Certif., Bates p. WF-Alijaj 134.)

99.     Marsicano noted that although Fogarty provided additional training to Plaintiff during his three-day visit to the New York City offices on July 27-29, Plaintiff continued to "struggle with understanding basic concepts."  Plaintiff continued to "ignore[]" discrepancies among financial reports; failed to complete Loanet testing; provided reports that were incomplete; failed to ask questions for clarification; and exhibited a poor attitude when asked to fix errors. (Dep. Ex. Alijaj-10 Bates p. WF-Alijaj 132.)

100.     On September 15, 2015, Marsicano detailed a number of deficiencies in Plaintiff's performance:

> Rob Sackett, the head of the Sec Lending desk called me and requested a summary of expenses related to the Principal Lending business. Getting more involved with the Principal Lending initiative was on Skender's Performance Improvement Plan. When I asked him to prepare it, he seemed **confused as to what the Principal Lending business was**. He said, "I'm under the impression that Sec Lending is the Principal Lending business." He also **asked why Rob Sackett didn't already know the expenses. He's said this often when I ask him to prepare a report or**

**look into something for the business**. However, he did say he would prepare something for Rob that day. **I asked him to send it to me first before sending to the desk. He left Wednesday night without sending me the file.** I had a meeting on Thursday at 10 am with Rob Sackett as he asked me to stop by to review the expenses. **I had to prepare the file myself which took about 15 minutes.** Skender never notified me why he couldn't finish the report on Wednesday but **he said that Rob didn't need it right away so he didn't think he needed to do it**. It's frustrating that he didn't finish the report when I asked him to. What's even more frustrating is that **every day I'm noticing that he steps away for almost 3 hours** (half hour here, an hour there, an hour here, another half hour there). Not having enough time is not the reason why this wasn't done. Last week I took screen shots of my Lync screen showing he was gone for at least 2 hours but lately it's been more than that. Now **I find myself doing work he should be doing to meet deadlines and get reports the desk wants on time**. It is difficult to manage someone who **doesn't want to be managed**. And it is obvious in his actions and statements that he **really doesn't want to be here**.

(Dep. Ex. Alijaj-10 Bates pp. WF-Alijaj 127-28; emphasis added.)

### F.    Plaintiff Is Placed on "Formal Warning – Performance."

101.    On September 22, 2015, Fogarty flew from North Carolina to New York City to hand deliver to Plaintiff a written formal warning, entitled "Formal Warning – Performance." (Dep. Ex. Alijaj-12, Ex. O to Tandy Certif.; Pl.'s Dep. 151:9-153:5.)

102.    Plaintiff testified at deposition that Fogarty told him his "performance hasn't improved, it is actually deteriorated and we're putting you on a formal performance warning." (Pl.'s Dep. 151:16-152:2.)

103.    The Warning itself stated that it was given "for failure to meet performance standards and work expectations in the area of various aspects of being a Product Controller for the Securities Lending Desk."  (Dep. Ex. Alijaj-12 Bates p. WF-Alijaj 12.)

104.    Under the heading "Reason for corrective action" the Warning stated:

On July 7th, 2015, you were given an informal verbal warning which was followed by a written informal warning on July 27th, 2015. Since then, you have failed to meet these expectations as follows:

...Since the delivery of the informal warning you have not met expectations and have not even been proactive or even reactive in supporting the Securities Lending

16

desk. There have been multiple instances of breaks or issues that went undetected and once you were notified of the breaks or issues you declined to address them.

*   *   *

Some examples of not meeting expectations:

- Compile and evaluate the daily P&L and journal entries – there have been occasions when the daily P&L sent distributed was incorrect and the checks in place to detect these types of issues were simply ignored.

- Prepare and review monthly financials – there have been multiple occasions in which your performance has been lacking. You failed to update commentary included in the monthly financials and the commentary that was added provided little to no value to the user. An example is just restating the name of the expense in the commentary.

- Update the Outlook – you have struggled to update the Outlook each month including FIT overrides.

- Team Effectiveness – Since your informal warning there has been a further decline in team effectiveness with both Cathy Marsicano and Mike Fogarty.

- Overall your performance has declined since the informal warning. You seem to have a disinterest in your current role which is clearly shown by your attitude and work product.

(Dep. Ex. Alijaj-12 Bates p. WF-Alijaj 13.)

105.   Plaintiff was also warned that he was "expected to treat your supervisor and other managers with respect, which includes avoiding insubordinate behavior."  (Dep. Ex. Alijaj-12 Bates p. WF-Alijaj 13.)

106.   Plaintiff was told he was "expected to show immediate and sustained improvement," absent which "you may be subject to further corrective action, up to and including termination of employment."  (Dep. Ex. Alijaj-12 Bates p. WF-Alijaj 13.)

107.   The Formal Warning provided that Plaintiff would meet with Fogarty weekly "to review your progress against the performance standards outlined above," and after receiving the

17

Formal Warning, Plaintiff did continue to meet with Fogarty and Marsicano on a weekly basis. (Pl.'s Dep. 177:8-12; Dep. Ex. Alijaj-12 Bates p. WF-Alijaj 13.)

108.    Plaintiff understood that "[l]egally" Fogarty could have terminated his employment without giving him a formal warning.  (Pl.'s Dep. 165:18-21.)

   **G.    Plaintiff Complains to Human Resources.**

109.    On September 23, 2015, the day after Fogarty presented Plaintiff with his Formal Warning, Plaintiff sent an e-mail to Human Resources, specifically Maria De Leon (subsequently Maria Ison), an Employee Relations Consultant-HR Advisor, complaining that "[t]he writing is on the wall," "[t]here is no interest to help me," and "[i]t's obvious, they have no good will towards me at all.  It's just a formality now."  (Dep. Ex. Alijaj-13, Ex. P to Tandy Certif., Bates p. WF-Alijaj 283; Pl.'s Dep. 162:2-163:7; Dep. Ex. Alijaj-14, Ex. Q to Tandy Certif., Bates p. WF-Alijaj 318-19.)

110.    Plaintiff wrote that "Mike Fogarty and Catherine Marsicano are collaborating on the harassment," but did *not* make any allegations of national origin, religious, age, or any other type of discrimination.  (Dep. Ex. Alijaj-13 Bates pp. WF-Alijaj 283-84; Pl.'s Dep. 166:6-10.)

111.    Between September 30, 2015, and October 16, 2015, Plaintiff had 12 pages of e-mail exchanges with De Leon-Ison and nowhere among the 7,000-plus words in those 12 pages of e-mail exchanges does Plaintiff ever allege national origin, religious, age, or any other type of discrimination.  (Dep. Ex. Alijaj-14; Pl.'s Dep. 167:10-177:7.)

112.    On October 22, 2015, the last day of Plaintiff's Formal Warning,  Plaintiff sent De Leon-Ison an e-mail asking her to "escalate" his complaints "to someone who will take action and address my work place concerns," because he was dissatisfied with his "over a month of discussion

with Maria De Leon." (Dep. Ex. Alijaj-16, Ex. R to Tandy Certif., Bates pp. WF-Alijaj 76-77; Pl.'s Dep. 186:23-188:2, 189:4-190:4, 191:8-10, 191:19-22, 192:20-193:6.)

113.    Plaintiff, however, did not allege any type of discrimination in that e-mail.  (Pl.'s Dep. 190:15-18.)

114.    De Leon-Ison escalated Plaintiff's complaints to Senior Employee Relations Consultant Susan Roberts, sending Plaintiff a Dispute Resolution Request form, which Plaintiff never bothered to complete.  (Dep. Ex. Alijaj-16 Bates pp. WF-Alijaj 75-76; Pl.'s Dep. 190:19-191:7, 192:8-193:6.)

115.    Plaintiff spoke to Roberts by telephone several times.  Roberts asked Plaintiff what he meant by being subject to "harassment," "hostility," "badgering," and "improper, dishonest, and unethical behavior."  (Dep. Ex. Alijaj-17, Ex. S to Tandy Certif.; Pl.'s Dep. 193:25-194:4, 194:8-11, 196:24-197:5, 203:24-204:5, 204:16-19.)

116.    In response, Plaintiff made *no* allegations of national origin, religious, age, or any other type of discrimination. (Dep. Ex. Alijaj-17; Pl.'s Dep. 193:25-195:2, 196:21-201:24, 203:24-205:2.)

117.    Rather, Plaintiff explained that by "harassing," he meant "persistent criticism, the questioning, the nit-picking.  Cathy has done the P&L, she knows where the information is, she knows where things are.  Why the constant criticisms constantly of me?  Never any positive praise?  I am constantly being asked for information that Cathy already has.  When there is no mistake, nothing is said.  What is the point of documenting it.  Building a case." (Dep. Ex. Alijaj-17 Bates p. WF-Alijaj 232.)

118.    By "hostility," Plaintiff meant "the constant criticism."   (Dep. Ex. Alijaj-17 Bates p. WF-Alijaj 232.)

119.    By "badgering," Plaintiff meant "the constant Skender this, Skender that, but no help from my leaders."  (Dep. Ex. Alijaj-17 Bates p. WF-Alijaj 232.)

120.    By "improper" behavior, Plaintiff meant "I don't feel like I should be on corrective action.  I feel she should speak to me and coach me."  (Dep. Ex. Alijaj-17 Bates p. WF-Alijaj 232.)

121.    By "dishonest" behavior, Plaintiff meant "my formal warning that I don't agree with."  (Dep. Ex. Alijaj-17 Bates p. WF-Alijaj 232.)

122.    By "unethical" behavior, Plaintiff meant, "They are blaming me for not making the stage when the corrective action that they are using isn't matching my performance. The weekly calls, what is it that we are doing? Discussing the errors? Why? What are they doing to help me? What did they do to help me to correct the issue? How do you know that they are doing what they should be doing? I don't think they are handling the meetings correctly – I want the list of things they are addressing with me."  (Dep. Ex. Alijaj-17 Bates p. WF-Alijaj 232.)

123.    At no time did Plaintiff claim he was subjected to discrimination or harassment based on any protected category. (Dep. Ex. Alijaj-17 Bates p. WF-Alijaj 232.)

124.    The last time Plaintiff spoke to Roberts was on November 5, 2015, four days before his termination.  (Pl.'s Dep. 193:10-13, 209:8-12, 210:8-9.)

125.    At that time, Roberts informed Plaintiff that she had concluded her review of his complaints, that there was no deviation from Wells Fargo policy in the corrective actions taken against Plaintiff or in the dispute resolution process, and that it was up to Plaintiff to address his issues with the finance management team.  (Pl.'s Dep. 195:3-8, 209:8-19.)

**H.    Plaintiff's Termination.**

126.    Plaintiff's performance continued to deteriorate after the Formal Warning as noted by Marsicano in her weekly e-mails to Rottmann and Fogarty:

- Plaintiff "continued his trend of disappearing from his desk for hours on end." Even on a day when the building closed at 3:30 P.M., Plaintiff still managed to be "gone for 2.5 hours."

- Plaintiff failed to be proactive and respond to questions from the Securities Lending Desk and schedule meetings requested by Fogarty;

- Plaintiff failed to address a known discrepancy for the entire month, causing a "tight deadline" at the end of the month;

- Plaintiff prepared a P&L statement with an error that he "did not research or even notice" until Marsicano brought it to his attention and the statement had already been sent out.

- Marsicano discovered that the General Ledger entries provided by Plaintiff did not match the monthly numbers and requested that Plaintiff "look into what happened."  Plaintiff, provided Marsicano with the same incorrect analysis he had already provided.  (Dep. Ex. Alijaj-10, Ex. M to Tandy Certif., Bates p. WF-Alijaj 127; E-mail from Marsicano to Rottmann & Fogarty dated Oct. 29, 2015, Bates p. WF-Alijaj 796, Ex. T to Tandy Certif.)

127.    On October 29, 2015, Marsicano noted, "There is a risk of things falling through the cracks with this type of behavior. I'm doing the best I can to make sure he's doing the right thing, but if he never brings issues to my attention and I'm caught up with other things, issues can be missed."  (E-mail from Marsicano to Rottmann & Fogarty dated Oct. 29, 2015, Bates p. WF-Alijaj 796, Ex. T to Tandy Certif.)

128.    On November 4, 2015, Fogarty formally recommended that Plaintiff's employment with Wells Fargo be terminated, preparing an e-mail to Rottmann, Marsicano, and Emily Hudson, Wholesale Banking HR Advisor/Employee Relations, that stated:

> The main issues with Skender are two fold.  He is an **ineffective product controller** and he has a **poor attitude**.  He takes a **very narrow scope of his responsibilities** and is **very hostile** in almost every interaction.  I have attached an email chain that has Cathy's weekly summaries which documented all the various issues with Skender's performance.  Skender was given a verbal warning via phone on July 7, 2015 which was accompanied by a written informal warning, also known as a Performance Improvement Plan, on July 22nd which is attached.  As part of the Performance Improvement Plan, Cathy and I have met with Skender nearly every week to discuss his performance that week and compare it to the plan.  He

21

**continued to exhibit the same behaviors** after his Performance Improvement Plan was delivered so he was given a formal warning on September 22nd which is attached. **Again he continued to exhibit the same behaviors**. At this point it has been 4 months since his verbal warning and **his performance has not improved. In fact it has gotten worse**. As a result, I am recommending termination of employment at this time.

(E-mail string Bates pp. WF-Alijaj 850-51, Ex. U to Tandy Certif.; emphasis added.)

129.    Rottmann approved the termination.  (*Id.* Bates p. WF-Alijaj 850.)

130.    Plaintiff believes Rottmann and Fogarty made the decision to terminate his employment.  (Pl.'s Dep. 214:24-215:3.)

131.    Pawlush, the head of the Equity Derivatives Group that Plaintiff worked in before transferring to the Securities Lending Group, was not involved in the decision to terminate Plaintiff's employment.  (E-mail string Bates pp. WF-Alijaj 850-51, Ex. U to Tandy Certif.; Pl.'s Dep. 25:25-26:18, 214:24-215:8.)

132.    On Monday November 9, 2015, Fogarty terminated Plaintiff in person.  (Pl.'s Dep. 210:8-15.)

133.    Plaintiff did not appeal his termination.  (Pl.'s Dep. 210:18-20.)

**V.    Plaintiff's Claims.**

134.    Plaintiff's Complaint asserts claims that Wells Fargo retaliated against him and terminated his employment because of his national origin, religion, and age.  (Compl., Doc. 1, pp.1-3 of 55, Ex. A to Tandy Certif.)

**A.    Retaliation.**

135.    Plaintiff never complained internally at Wells Fargo about discrimination based on his national origin, religion, age, or anything else.  (*Supra* ¶¶55-56, 90-92, 109-23.)

22

**B.   Discrimination.**

136.   Plaintiff is of European origin; he identifies as Albanian.  (Pl.'s Dep. 117:4-12, 213:19-22.)

137.   Plaintiff's religion is Muslim.  (Pl.'s Dep. 212:20-213:2.)

138.   Plaintiff's date of birth is August 17, 1965; Plaintiff was 46 years old when he became an employee of Wells Fargo in September 2011; he was 50 years old when his employment with Wells Fargo was terminated in November 2015.  (Pl.'s Dep. 48:19-22.)

**1.   National Origin.**

139.   Plaintiff alleges that he was discriminated against because of his European national origin.  (Pl.'s Dep. 23:21-25.)

140.   The only basis for Plaintiff's claim of national origin discrimination is Plaintiff's allegation that Tamara Ljeskovac, who Plaintiff refers to as a "Serbian woman," and Peter Pacitto, who Plaintiff refers to as an "Italian man," left the Equity Derivatives Group after George Pawlush took charge of it.  (Pl.'s Dep. 25:6-10, 49:15-50:4, 50:11-14, 51:9-11, 216:21-217:5.)

141.   Plaintiff does not know what the performance ratings were of either Ljeskovac or Pacitto.  (Pl.'s Dep. 50:15-25, 51:19-21, 214:12-15.)

142.   Ljeskovac left Wells Fargo, but Plaintiff does not know why.  (Pl.'s Dep. 24:25-26:1, 51:2-7, 214:12-15.)

143.   Pacitto transferred to another department at Wells Fargo and was still employed there when Plaintiff was terminated in November 2015.  (Pl.'s Dep. 53:3-5.)

144.   Plaintiff does not know whether Ljeskovac and Pacitto were born in the United States.  (Pl.'s Dep. 217:15-24.)

145.    Neither Ljeskovac nor Pacitto ever told Plaintiff they believed they were being discriminated against.  (Pl.'s Dep. 218:13-16.)

146.    No one at Wells Fargo ever made any comments to Plaintiff concerning his European origin.  (Pl.'s Dep. 27:8-11.)

## 2.    Religion.

147.    Marsicano never made any comments to Plaintiff based on his religion that he viewed as discriminatory or inappropriate.  (Pl.'s Dep. 70:8-11.)

148.    In fact, Plaintiff *never* heard any comments relating to his religion.  (Pl.'s Dep. 27:21-23.)

149.    Plaintiff does not know Marsicano's religion.  (Pl.'s Dep. 70:12-14.)

150.    Fogarty did not know Plaintiff's religion.  (Pl.'s Dep. 71:3-6.)

151.    In answer to the question whether Rottmann knew his religion, Plaintiff testified, "Never discussed it with him."  (Pl.'s Dep. 108:12-14.)

152.    Plaintiff acknowledged that when he testified "didn't discuss" or "was not discussed" or "never discussed," that means "did not know."  (Pl.'s Dep. 28:10-18.)

153.    Plaintiff gave the same answer to the question whether he knew Rottmann's religion.  (Pl.'s Dep. 108:15-17.)

154.    Plaintiff conceded at his deposition that the only "facts" supporting his allegation that he was discriminated against based on his religion was a conversation he had with George Pawlush at a December 2013 holiday party.  Pawlush asked Plaintiff why he was not partaking of the free alcoholic beverages, and Plaintiff explained that it was because he was Muslim.  (Pl.'s Dep. 53:6-54:15, 213:3-14.)

155.    Curiously, Plaintiff also testified at his deposition that Pawlush *did not know* he was Muslim:

> Q.    You claim also earlier when you said discrimination because you are Muslim.  Did you ever hear anyone make any comments about your religion being Muslim?
> A.    George Pawlush didn't know that I was Muslim.
>
> Q.    Mr. Pawlush did not know you were Muslim?
> A.    No.

(Pl.'s Dep. 27:12-20.)

### 3.    Age.

156.    Plaintiff's age, and age generally, "wasn't discussed," was "never discussed," between Plaintiff and Rottmann, Pawlush, Tracy, Fogarty, Marsicano, or any manager.  (Pl.'s Dep. 27:24-28:23, 48:25-49:3, 71:7-8, 117:17-22.)

157.    Plaintiff testified he did not experience age discrimination in the Equity Derivatives Group.  (Pl.'s Dep. 49:4-14.)

158.    Plaintiff does not know the ages of employees in the Equity Derivatives Group. (Pl.'s Dep. 216:3-11.)

159.    Plaintiff does not know the ages of employees in the Securities Lending Group. (Pl.'s Dep. 216:12-15.)

160.    The only basis for Plaintiff's claim of age discrimination is his subjective belief that he was replaced by a younger employee after his termination:

> Q.    And what facts do you have to support your belief that there is a younger employee performing your exact duties and responsibilities?
> A.    He is the one that replaced me.
>
> Q.    How do you know that he replaced you?
> A.    He is the only one in that office.

25

Q.   Are you aware of what his duties and responsibilities are?
A.   That I am not, no.

Q.   So you are not aware if he is performing the same duties and responsibilities that you performed, are you?
A.   I am not, no.

Q.   Is that the only fact that you have to support your belief that you were discriminated against based upon your age?
A.   That I was replaced by a younger person, yes.

(Pl.'s Dep. 211:24-212:19.)

**VI.    Plaintiff's Lawsuit.**

161.    Plaintiff filed a charge of discrimination with the Equal Employment Opportunity

Commission ("EEOC") on September 1, 2016.  (Compl. pp. 3, 5 of 55, Ex. A to Tandy Certif.)

162.    The EEOC issued Plaintiff a right-to-sue letter on December 14, 2016.  (Compl. p.

17 of 55.)

163.    Plaintiff alleges he received the right-to-sue letter on December 17, 2016.  (Compl.

p. 4 of 55.)

164.    Plaintiff filed his Complaint in this action on March 15, 2017.  (Compl.)

Respectfully submitted,
FISHER & PHILLIPS LLP
Attorneys for Defendant Wells Fargo Bank,
N.A.

By:    *s/Colleen P. Tandy*
COLLEEN P. TANDY
For FISHER & PHILLIPS LLP

Dated:  October 26, 2018